497 P.2d 244

**FOREIGN STUDY LEAGUE, a Utah corporation, Plaintiff and Appellant,**

v.

**HOLLAND–AMERICA LINE, Defendant and Respondent.**

No. 12445.

Supreme Court of Utah.

May 15, 1972.

Daniel L. Berman, Mary Lou Godbe, Salt Lake City, for plaintiff and appellant.

Albert R. Bowen, of Ray, Quinney & Nebeker, Salt Lake City, John S. Rogers,

of Burlingham, Underwood, Wright & Lord, New York City, for defendant and respondent.

HENRIOD, Justice:

Appeal from an order quashing service of process in an action instituted under the Utah Declaratory Judgment Act (Title 78–33, Utah Code Annotated 1953). Reversed and remanded for further proceedings consonant with this decision, with costs to plaintiff.

The question here, that of whether a nonresident is doing business in the state is strictly a factual one, and each case, therefore, must be determined on its own peculiar and significant facts[1] to determine if the local forum has jurisdiction to try and adjudge the claims or obligations of one domiciled elsewhere. The rule leading to a conclusion that such nonresident constitutionally must subject himself or itself to the jurisdiction of our courts, is one of reason,—which is only an alternate way of saying that the minimum guarantees of due process must be afforded, else our courts are without authority to bind or grant relief to the nonresident. This concept is embraced within the prefatory language of our so-called Long Arm Statute[2] which says the act "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution,"—to provide "an effective means of redress against nonresident persons, who through certain *significant minimal contacts* with this state, incur obligations to citizens entitled to the state's protection." It appears almost obvious that this language was prompted by International Shoe v. Washington,[3] which used the word "minimum" contacts rather than "minimal" contacts employed in our act,—which language seems to be synonymous, but motivated by our use of "minimal" in our case of Hill v. Zale.[4]

Since these cases are strictly factual and dispositive by the application of case and statutory law to the fact situation presented in the instant case, there seems to be merit in recalling the facts and conclusions in the Shoe and Zale cases (upon which our act seems to be founded), in some kind of qualitative and/or quantitative analytical comparison with those in the instant case for a solution of the problem by this tribunal.

1. McGriff v. Chas. Antell, 123 Utah 163, 256 P.2d 703 (1953).

2. Title 78–27–22, Utah Code Annotated 1953 (Laws of Utah 1969, ch. 246, sec. 1; Vol. 9, 1971 Pocket Supplement, p. 44).

3. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

4. 25 Utah 2d 357, 482 P.2d 332 (1971).

In the Shoe case,—one involving contributions by employers to a workmen's compensation fund, the Shoe Company, domiciled in St. Louis, had no place of business or office in Washington State, no contracts of sale there, no stock of merchandise there, but employed resident salesmen there. They worked on commissions, carried samples and occasionally rented sample rooms paid for from St. Louis. They sent their orders to St. Louis for acceptance or rejection, and if accepted the shoes were shipped from the Missouri city to buyers in Washington. The salesmen had no authority to enter into contracts or make collections. The United States Supreme Court said that Constitution-wise this was doing business in Washington warranting the invocation of jurisdiction there to determine controversies between Washingtonians buying footwear there from lasts abroad.

In the Zale case plaintiff Hill, who claimed wages earned in Alaska as employee of Zale, a Texas corporation, sought recovery in Utah, asserting that Zale was "doing business" in Utah. Zale was a jewelry outfit for whom Hill had worked in Utah. It had stores in a number of states,—several of which in Utah were subsidiarized and subsidized by separate corporations officered by identical gentlemen. The advertising, collections and auditing functions funneled in and out of the subsidiaries and their defendant parent, that paid the salaries of all employees. Ostensibly, Zale of Texas, was phantom in Utah. Nonetheless, we had little or no difficulty in holding that it was mundane enough to have used Utah in such fashion as to conclude that the hand it extended here for profit equally was capable of effectively accepting service of process.

Now, as to the facts in our instant case: It is believed and submitted that the evidence adduced under the discovery process, substantially and without serious contradiction, accurately may be abstracted thus:

Plaintiff is a Utah corporation which, among other things, charters ships for educational purposes, visiting foreign lands. Defendant on its ship accommodates such travel for a fixed fee. It has offices principally in Rotterdam, but also in New York, San Francisco, Los Angeles and other likely ports of call. Most of the evidence in and out of the inordinately protracted transcript here, flows from the frank responses of two top officials of the Holland-America sail and sales maritime operations. The interpretations of their frankness by the litigants here understandably are poles apart.

Tuinman, a top and authoritative representative of defendant says: That he resides in New York, is general sales manager for defendant; that he markets defendant's passenger service in the United States, amounting to about forty million

dollars per year, including charter service, in which area the plaintiff was by far its chief customer in 1968–9, and out of which a roughly estimated gross of $600,000 was realized from the Utah-based corporation's relations with defendant,—and in which sales effort he had a close connection; that his company's operations were fostered by field agents, also through about 18 or 19 travel agents in Utah who were authorized through defendant's front institution Trans-Atlantic Passenger Conference, by written agency contracts, ratified by, subscribed to and authorized by defendant, to display in Utah the defendant's literature, "sell bookings" on its behalf, and receive commissions for accepted bookings; that defendant's representatives call on them personally (in Utah), encourage them to sell defendant's space on the ship; that defendant has field agents that do about the same thing; that Mr. Tuinman knew Mr. Touw who used to work for the Holland Company, but now for plaintiff, who was responsible for the first college cruise contract between plaintiff and defendant; that Mr. Tuinman, because of his friendship for Touw, made combined social *and* business calls on the latter in Utah; that he called in March 1969 and in January 1970, meeting with Touw and plaintiff's attorney with respect to a contract to employ a ship for a foreign trip; that one trip for a college was completed through plaintiff in 1969; that talks took place in Utah, New York and Rotterdam; that business was always discussed on such occasions; that in 1968 and 1969, with respect to the ship Ryndam, plaintiff was defendant's principal customer; that there were correspondence, telegrams and telephone calls with respect to chartering the Ryndam, between local authorities for plaintiff and those of defendant; that he sent out an agreement for employment of the Ryndam in 1970; that it was not signed by plaintiffs,—but that by telegraphic and phonic communication, Tuinman insisted that a contract had been consummated; that he came to Utah to confer with plaintiff's officers re a dispute or misunderstanding as to the contract for 1970,—at plaintiff's request, so he says; that he was in Salt Lake a couple of days and another representative stayed longer.

Although these uncontradicted statements on the part of one of defendant's top officials seem rather persuasive in concluding that the defendant did business here under the letter and spirit of the Shoe case, the Zale case, and our Long Arm Statute, the following facts also should lend weight to a conclusion that there was a "doing business" in Utah under the act that justified the local court's exercising jurisdiction without aborting the due process concept.

About two weeks *after* plaintiff filed this suit in Utah, defendant filed a suit in

New York to collect damages for a breach of a contract executed by plaintiff,—which plaintiff here asserts to be unenforceable for one reason or another. It is difficult to understand how defendant can take the position that there *is* a contract, that under the facts recited above seem to have some basis for a conclusion that there were business dealings in Utah, but that everything, including the charter, profit, execution of the contract, etc., was accomplished outside of Utah. At any rate, comparing this case with the Shoe and Zale cases, we think the trial court erred,—particularly when its decision was bottomed at least on a statute [5] not cited in the brief and apparently not relied upon by either party as a matter for appeal here.

The record further reflects that Holland signed "Sub-Agency Appointment Agreements" with local travel agents wherein the agents agreed to comply with the company's instructions and the regulations of the Steamship Conference, of which defendant was a member, and in which comprehensive terms and conditions were incorporated relating to the sale of tickets, escrowing fares, etc., largely as testified to by Holland's Mr. Tuinman. It is conceded that each travel agent is not an exclusive agent for the steamship line and there is some kind of merit to a contention that there must be more contacts than just sales and sales promotions within the state by independent non-exclusive sales representatives, to constitute doing business. The contention would seem to beg the question, however, since it is based on the assumption that such sales and promotion are the *only* contacts in the state,—but in the instant case and in the Shoe case and in the Zale case the "more contacts" *were* extant. These last mentioned contacts cannot be ignored, and the written agency contracts mentioned using the term "agent" time and again, and containing elements of control at least when sales were accomplished, making such "agents" trustees for defendant and keepers of the faith for the latter, certainly do not detract from the ultimate conclusion that they, supportive of other facts, are part and parcel of a bundle of facts which in the aggregate are not misnomered if called "doing business" in the statutory and constitutional connotations of that phrase.

The record reflects that after considerable talk at a March 1969 meeting in Utah where minutes were taken, with plaintiff's counsel present, concerning a charter party for the ship Ryndam in 1970, after one had been completed in 1969, and after considerable telephonic and telegraph communications between the parties,—plaintiff in Utah and defendant in New York,—defendant, in November 1969 sent a lengthy and detailed contract to plaintiff in Salt Lake City for signature. The record is

5. Title 16–10–102 (Laws of Utah 1963, ch. 19, sec. 8; Vol. 2, 1971 Pocket Supp., p. 263).

not too clear as to why it was not signed, except as reflected in the complaint, but a $160,000 check was sent to defendant in connection with the negotiations for the 1970 charter party. The Utah meetings were characterized and emphasized in defendant's brief as being strictly social and sort of in between stops. Such characterization does not reconcile itself as an absolute, with the frank concessions of Mr. Tuinman that the meetings were social *and* business meetings, and that business was discussed at all of them, nor with the fact that after the proffered contract was forwarded to plaintiff, but rejected without signature, Mr. Tuinman came to Salt Lake in January 1970 to discuss the differences.

We think that under the International Shoe case and the Zale case, the order quashing service of process was in error, and the case remanded for further proceedings,—and that there is no useful purpose in discussing any of the other authorities cited by the parties.

CALLISTER, C. J., and TUCKETT, J., concur.

CROCKETT, Justice: (dissenting).

I am unable to reach the same conclusions as to the facts, nor as to the application of law to them, as does the majority opinion. I do not see that there is any substantial disagreement among us as to the applicable principles of law: that foreign corporations are not subject to the jurisdiction of the courts of this State unless they have a "business presence" here. This requires the engaging in business or activities to the extent of "at least certain minimum contacts" therein. This is not satisfied by contacts which are merely irregular or sporadic, but there must be some carrying on of the business in a manner which is to some degree systematic and continuous, so that it can fairly be said that the corporation has a business presence in the state such that the maintenance of the suit and the compelling of a defense therein does not offend against traditional notions of fair play and substantial justice.[1] As the main opinion correctly points out, this entails "more contacts . . . than sales and sales promotion within the state by independent nonexclusive sales representatives."

I am also in agreement with the statement of the main opinion that "these cases are strictly factual" and that they are to be determined by application of the law to the facts of the particular case. However, we should also keep in mind that our basic rule of appellate review requires us to accord to the trial court the prerogative of weighing the evidence and of drawing inferences therefrom, and upon that basis of

1. Footnote 3 of main opinion.

determining the facts. It is the duty of this court to respect that prerogative: to look at the evidence and the inferences therefrom in the light favorable to sustaining the findings and judgment of the trial court, and not to the contrary for the purpose of overturning the findings and judgment as the main opinion impresses me as doing here.

On the basis of the pleadings, affidavits, answers to interrogatories, and a plenary hearing, the trial judge made his findings and ruling in the form of a memorandum decision, extensively treating its view of the facts and the law, and which includes the following statements:

In the case at bar, the plaintiff relies upon two visits to Utah by agents of defendant as constituting the "significant minimal contacts" to give this court jurisdiction under the statute and the due process clause. One was on March 31, 1969, which was before the effective date of the long-arm statute in question, and the other in January, 1970, upon which occasion defendant's agents were requested to come to Utah by plaintiff's agents without disclosing to defendant's agents, and intentionally so, that the purpose of the requested visit was to advise defendant that plaintiff would not use the Ryndam [defendant's ship] in 1970.

*　　*　　*　　*　　*　　*

2. Footnote 3 of main opinion.

The "activities" of the March 31, 1969, meeting were at most, one part of the negotiations between the parties, and even if the Boston sailings were discussed at that meeting, in order for me to find that "obligations" were incurred or that a "claim" arose therefrom, it would require me to first find that a contract exists which is what plaintiff . . . denies.

It is therefore, my conclusion that the activities of the defendant in this state were not sufficient to meet minimal requirements of the due process clause and the defendant's motion to quash the service of summons should be granted.

The case of International Shoe v. Washington[2] is the landmark authority in this field. As indicated in the majority opinion, that decision was based on the fact that the company employed resident salesmen in the state of Washington who had authority to conduct business and engage in activities in behalf of the company. It should also be noted that that decision was an affirmance of such determination by the Washington court, whose prerogative it was to find the facts, and not a reversal thereof on appeal, as is being done here.

In the recent case of Hill v. Zale Corporation,[3] 25 Utah 2d 357, 482 P.2d 332, we stated that the question of whether

3. Footnote 3 of main opinion.

a foreign corporation is "doing business" within the state to subject it to the jurisdiction of our courts is to be determined from consideration of all of the relevant circumstances. That opinion pointed out a number of significant activities of the Zale Stores organization in Utah which distinguish it from the instant case. The Utah stores, though separate corporations, all did business under the name of Zale Stores, similar to the parent Texas corporation. The officers and directors, and the actual policy-making management, were practically identical. This was also true of the holding out to the public in advertising and in doing business; and of vital importance, the Utah stores did not have individual bank accounts, but the money was deposited to the credit of the Zale-Texas Corporation which controlled and disbursed it.

By way of contrast to the Zale case, in the instant one there is a considerably different fact situation. The defendant Holland-America Line has no stores or offices in Utah by that name, or at all. It has no employees or personnel here. The only outlet or contact with the public is through the travel agencies who are authorized to book its services along with similar services for other transportation companies. None of them serve Holland-America exclusively, but all book other transportation services generally. Each agency has a subagency appointment by agreement with the secretary of the Trans-Atlantic Passenger Steamship Conference. It permits the agency to book travel for its members in conformity with certain terms and procedures as determined for the most part by the Conference. The individual travel services, such as defendant Holland-America, arrange for distribution of their own literature, reservation rates, acceptances of reservations, and commissions to the agencies. Neither the travel services generally, nor this defendant, maintain separate offices, directory listings, or employ their own sales agents. Defendant's evidence also is that instead of being constant and regular, it has been somewhat inconsistent and sporadic in its advertising and contacts with the travel agencies in Utah.

It seems to me that fairness requires that this court keep the balance of justice true by applying the law in the same manner when it is to the disfavor of our courts and the disadvantage of our citizens as when it is to the contrary. This requires us to compare our own adjudication in Conn v. Whitmore [4] where we denied jurisdiction to the state of Illinois. There a similar problem was involved, but with the facts reversed. The plaintiff Conn was a resident of Illinois. Invoking their "long-arm" statute, he had served defendant Whitmore, a resident of Utah, and had

---

4. 9 Utah 2d 250, 342 P.2d 871 (1959).

obtained a judgment for which he was seeking full faith and credit in our Utah court. Whitmore challenged the Illinois court's jurisdiction and sought to defend on the merits here. Plaintiff Conn had solicited business (sale of horses) by mail in Utah. Whitmore had sent an agent to Illinois to look over the horses; had sent part of the purchase price in the mail, and had sent his agent who paid the balance and took delivery of the horses in Illinois. It is my opinion that there was at least as much "contact" by Whitmore in doing business in Illinois in that case as there is of Holland-America Line doing business in Utah in this one. Yet we held that this did not constitute the "transaction of business" by Whitmore in Illinois to give it jurisdiction within the meaning of its "long-arm" statute.

Based upon what has been said above, I am unable to see any justification for overturning the findings of our trial court, and would sustain his ruling.

ELLETT, J., concurs in the dissenting opinion of CROCKETT, J.