**UNION SKI COMPANY, Plaintiff and Appellant,**

v.

**UNION PLASTICS CORPORATION, Defendant and Respondent.**

**No. 14065.**

Supreme Court of Utah.

March 31, 1976.

J. Brent Wood, Provo, Dave McMullin, Payson, for plaintiff and appellant.

Douglas J. Perry, Salt Lake City, for defendant and respondent.

CROCKETT, Justice:

Plaintiff, Union Ski Company, a Utah corporation, brought this action against defendant, Union Plastics Corporation, a California corporation, to recover for damages allegedly suffered because of defendant's breach of contract relating to a plan for defendant to manufacture ski boots. Defendant was served as provided in section 78–27–25, U.C.A.1953, the so-called Long-Arm Statute. From the granting of de-

fendant's motion to dismiss for lack of jurisdiction over it, the plaintiff appeals.

In the fall of 1973, Brent C. Hall, a Utah resident, visited the Union Plastics (Plastics) plant in California to discuss the feasibility of having Plastics manufacture a ski boot for Miller Ski Company, which then employed Mr. Hall. In November, 1973, Miller abandoned the project. However, Plastics had indicated some interest in the plan, so Mr. Hall and Arben K. Jolley, also a Utah resident, formed a new Utah corporation, Sports Industries, Inc., to market the boots which Plastics would manufacture. The name was later changed to Union Ski Company.

Negotiations between the two firms began in November, 1973, and, on December 28, 1973, Arthur Eizenberg, general manager of Plastics, came to Utah. The trip was primarily a ski vacation for Mr. Eizenberg and his family, but he did bring a proposed contract, which proved unacceptable to Ski. Mr. Eizenberg returned to Utah on January 5, 1974, when he met with Ski. An oral understanding was arrived at, which was to be completed in typewritten form, and then executed by the parties, which was not then accomplished. After some changes, the contract in controversy here was signed in April, 1974, by Plastics in California.

For Utah to acquire jurisdiction over the defendant, it would have to be on the basis of our statute, Section 78–27–24, U.C.A. 1953, which provides:

> Any person . . . who in person or through an agent does any of the following enumerated acts, submits himself, . . . to the jurisdiction of the courts of this state as to any claim arising from:
>
> (1) The transaction of any business within this state;

> (2) Contracting to supply services or goods in this state; . . .

■ It is the prerogative of this State to set its own standards as to what contacts or activities within the State are sufficient to meet the requirements of that statute, so long as they do not fall below the requirements under adjudications based upon provisions of the Constitution of the United States, cited and relied upon by plaintiff.[1] Notwithstanding the asserted trend toward liberality in allowing the acquisition of jurisdiction, with which this court is generally in agreement, it is significant to note that in *Hanson v. Denckla*[2] decided subsequent to those cases, the United States Supreme Court warned against too extended an application of those decisions:

> But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. [citation] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him. [citations]
>
> \*   \*   \*   \*   \*   \*
>
> . . . [I]t is essential is each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. [citation][3]

It is undoubtedly true that effect should be given to the policy declaration in our

---

1. *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ; *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

2. 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

3. Id. at pp. 251, 253, 78 S.Ct. at pp. 1238, 1240.

statute,[4] that the jurisdiction of our courts should be extended to protect the citizens of this State consistent with concepts of fairness and equal justice under due process of law. But the other side of this coin is that the rule of law should also protect our citizens from suits in other states, unless they have engaged in some conduct or activity there beyond a mere casual or transitory presence therein; and concomitantly, that the residents of our sister states should be given the same protections here as we expect our citizens to be accorded there.

In harmony with the foregoing this court has consistently held that the transaction of business within the meaning of our statute requires that the defendant has engaged in some substantial activity with some degree of continuity within this State.[5] In the case of *Hill v. Zale Corp.*[6] we set forth a number of examples of activity to be examined in determining whether, by reason of any one of them, or any combination of them, it can fairly and reasonably be said that activities of the foreign corporation in this State should subject it to the jurisdiction of our courts.

In analyzing whether the plaintiff has shown that the defendant comes within that requirement, these propositions are to be considered: First, the burden was upon the plaintiff to affirmatively so demonstrate. Second, on appeal we indulge the presumption of verity and correctness of the trial court's determination and do not disturb it unless the plaintiff has shown that it was in error. Third, there is a further principle, recognized in this area of the law, which may be regarded as having some bearing on the trial court's determination here. That is, that it is generally thought to be more fair and

logical to find jurisdiction in the forum state when the major aspects of the activity out of which the cause of action arises occurs in that state; and conversely, that determination of jurisdiction in the forum state is less likely to be found where the principal activities (the execution of the contract, manufacture of the boots, and the payments therefor and defendant's alleged breach of the contract) take place elsewhere.[7]

The main activity of the defendant relied upon by the plaintiff is that of Mr. Eizenberg. He visited Utah a total of four times: the two occasions previously mentioned, and again on January 11, 1974, and April 5, 1974. On the latter visits, Mr. Eizenberg attended meetings about the planning of sales after the boots should be manufactured, and he also inspected Ski's operations. Defendant Plastics did pay for some work done by three employees selected and retained by Ski. But Plastics did not have any business situs by way of office or store or otherwise in the State, nor any property, inventory, telephone listing or bank account; nor do any advertising here. Further, the contract on which plaintiff relies was executed in defendant's behalf in California; it provided that all payments would be made to Plastics' bank there, that all shipments would be F.O.B. Plastics' California plant, where the shoes were to be manufactured; and that the laws of California would govern the agreement.

When the foregoing facts are considered in the light of the principles above discussed and as set forth in the cited cases, we are not persuaded that we should disagree with the determination made by the trial court: that it was not shown that the defendant had engaged in activities in this

---

4. See Sec. 78–27–22, U.C.A.1953.

5. *Mack Financial Corp. v. Nevada Motor Rentals Inc.*, 529 P.2d 429 (Utah); *Hanks v. Administrator of Estate of Jensen*, 531 P. 2d 363 (Utah 1975); *Transwestern General Agency v. Morgan*, 526 P.2d 1186 (Utah

1974); *Pellegrini v. Sachs & Sons*, 522 P.2d 704 (Utah 1974).

6. 25 Utah 2d 357, 482 P.2d 332.

7. Moore, Federal Practice, Sec. 4.25 (2d Ed. 1967), and authorities therein cited.

State sufficient to render it subject to the jurisdiction of our courts.

Affirmed. No costs awarded.

HENRIOD, C. J., and ELLETT and TUCKETT, JJ., concur.

MAUGHAN, Justice (dissenting):

For the following reasons I dissent:

All statutory references are to U.C.A. 1953, as amended. Our statute, 78–27–22, declares:

> It is declared, as a matter of legislative determination, that the public interest demands the state provide its citizens with an effective means of redress against nonresident persons, who through certain significant minimal contacts with this state, incur obligations to citizens entitled to the state's protection. This legislative action is deemed necessary because of technological progress which has substantially increased the flow of commerce between the several states resulting in increased interaction between persons of this state and persons of other states.

> The provisions of this act, to ensure maximum protection to citizens of this state, should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution.

The statute is a remedial one, and our law requires it be liberally construed; to effect its object, and to promote justice.[1] Aside from the statute cited in the footnote, its status as a remedial statute requires liberal construction. As was said in *Castle v. Delta L & W. Co.,*[2] "Being remedial, the statute must be liberally construed."

The court today fails to follow this law in several important particulars. It fails to recognize the legislative determination. It fails to recognize significant minimal contacts. If fails even to mention the obligations, viz., $25,000, inter alia, to a citizen entitled to this State's protection. It fails to recognize the increased interaction between persons of this State and persons of other states. Not only does it not insure maximum protection to citizens of this State, it insures only minimal protection. It would appear that the statute has been reversed to require maximum contacts with this State, in order to insure minimal protection to its citizens. Patently, the statute is not applied to the "fullest extent permitted by the due process clause of the Fourteenth Amendment"—the construction given it not only is not liberal, but extremely restrictive.

It is, indeed, questionable to say (as the court does today), it is the prerogative of this State to set its own standards, for in personam jurisdiction over nonresidents; when the legislature has already set the standards, and such jurisdiction is completely dependent upon, and limited only by, the Federal constitution, viz., the Fourteenth Amendment. In this connection, it should not go unnoticed that the Continental Congress, moved by oppressive state measures, inimical to a union of the states, convened the Constitutional Convention. A result of which brings to our legislature the power to set standards for in personam jurisdiction over nonresidents; to the "fullest extent of the Fourteenth Amendment." To hold otherwise, I believe runs counter to the due process clause of our own Constitution by denying due process of law to one of our citizens; which is not only not denied by our Constitution, but is

1. 68–3–2. "The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of this state. The statutes establish the laws of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice. Whenever there is any variance between the rules of equity and the rules of common law in reference to the same matter the rules of equity shall prevail."

2. 58 Utah 137, 140, 197 P. 584, 585 (1921).

guaranteed by the due process clause of the Fourteenth Amendment.

The question here is primarily a federal one, and secondarily a state one, although the legislature has certainly given it prime importance. In addition, we do not have the problem of a statute attempting to restrict the Fourteenth Amendment; but rather one which endorses its operation to the full. Taking jurisdiction of the facts in this matter would fall far short of the permissible limits of the Fourteenth Amendment.

The mobility of the economy has changed much since the International Shoe case, of 1945; and the law relating to jurisdiction over nonresident defendants has changed with it—Utah excepted. The concepts dealt with here are of such importance I wish to present my view of the facts, and how the law is applicable to them.

The question on appeal is whether the activities of a foreign corporation, in dealing with a Utah corporation, render the foreign corporation amenable to the jurisdiction of the Utah court; under the long-arm statute. Prior to the foreign corporation's answer, it interposed a motion to dismiss, accompanied by affidavits; the plaintiff submitted counter-affidavits. The motion to dismiss for lack of jurisdiction was granted. No findings were made. I would reverse and remand for a trial on the merits.

The protagonists are plaintiff-appellant, Union Ski Company, a Utah corporation, hereafter "Ski"; and respondent-defendant, Union Plastics Corporation, a California corporation, hereafter "Plastics."

Ski and Plastics entered into a contract, under which a ski boot was to be manufactured by Plastics and supplied to Ski. The contract contemplated long-range payments of which $25,000 was the initial payment—this initial payment was paid to Plastics by Ski. During the negotiations, the general manager for Plastics made several trips to Utah in the interest of this

contract, engaged local boot designers, organized and conducted a sales meeting for the promotion of the boot, personally negotiated with representatives of Ski for the manufacture, promotion and sale of that product. Plastics also had its hand in the advertising of the product and demanded that its name be used in any promotional efforts.

The contract, dated January 5, 1974, contemplated a long series of transactions, with advance payments of $75,000; beginning with 1974, purchases of ski boots totaling $600,000 were to be made; by 1978 a sales figure of $1,500,000 was to be reached. A memorandum by Plastics' general manager stated that Ski was to have the exclusive sales and merchandising operation, in return for which the advance payments of $75,000 would be made. By April of 1974, Ski had secured orders for the boot amounting to $218,000. No boots were supplied to Ski.

It is undisputed that Plastics received the $25,000 check, and negotiated it. It is not disputed that the contract was executed, but it is disputed where and when it was executed. Ski claims that all significant indicia of minimal contacts in Utah, sufficient to confer jurisdiction on the Utah court, occurred in Utah; Plastics claims that such indicia occurred in the state of California, and that no significant activities were carried on in the state of Utah by Plastics to justify the Utah jurisdiction. The conflicts in the affidavits themselves would be sufficient to require a trial of the issues of fact.

Today, the court states that determination of jurisdiction in a foreign state is less likely to be found where the principal activities take place elsewhere, and mentions the execution of the contract (the record shows complete disagreement on the place of execution), manufacture of the boot, the payments therefor, and defendant's alleged breach of contract. These points together with the assertion that one must maintain a business situs, execute the contract, make the payments in the forum

state; and that all shipments should be otherwise than F.O.B. outside the forum state, were all disposed of 31 years ago in *International Shoe Company v. Washington*.[3] There, in finding the state of Washington did have jurisdiction over a nonresident defendant, the court said:

> Appellant has no office in Washington and makes no contracts either for sale or purchase of merchandise there. It maintains no stock of merchandise in that state and makes there no deliveries of goods in intrastate commerce. . . . The authority of the salesmen is limited to exhibiting their samples and soliciting orders from prospective buyers, at prices and on terms fixed by appellant. The salesmen transmit the orders to appellant's office in Saint Louis for acceptance or rejection, and when accepted the merchandise for filling the orders is shipped f.o.b. from points outside Washington to the purchasers within the state. All the merchandise shipped into Washington is invoiced at the place of shipment from which collections are made. No salesman has authority to enter into contracts or to make collections.

The "long-arm statute"[4] gives us the pertinent definitions. "Any person" is defined to mean any individual, firm, company, association, or corporation. And "transaction of any business within this state" is defined to mean the activities of a nonresident person, his agents, or representatives in this State which affect persons or businesses within the state of Utah. Section 78–27–24 provides:

> Any person . . . whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from:
>
> (1) The transaction of any business within this state;
>
> (2) Contracting to supply services or goods in this state;
>
> \*     \*     \*     \*     \*     \*

In order to properly understand the mandate of the legislature, viz., that the long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution," we must examine those decisions of the United States Supreme Court, determining that clause in relation to the long-arm statutes, and related statutes, of our sister states. This is necessary because it is not contemplated, in our federal system, that each of fifty different jurisdictional enclaves be a final arbiter of the meaning of the federal constitution in litigation, between citizens of different states.

One of the principles established in the famous case of *Pennoyer v. Neff*[5] was that a court could not acquire jurisdiction over a nonresident party, by serving process outside the forum, or by publication. The first definite departure from that case occurred in *International Shoe Co. v. Washington*[6] where it was held there was jurisdiction over a nonresident party, not present within the territory of the forum; if that party had certain minimum contacts with the forum state, and if the maintenance of the suit did not offend "traditional notions of fair play and substantial justice." It was further held there that the terms "present" or "presence" merely symbolize the activities of a corporate agent, within the forum state, which will be deemed to be sufficient to satisfy the demands of due process; that an estimate

---

3. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

4. 78–27–22 through 28, L.Utah 1969.

5. 95 U.S. 714, 24 L.Ed. 565 (1877).

6. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

of the inconvenience incurred by defending a suit away from one's home state is relevant; that single or occasional acts of a corporate agent because of their nature and quality and the circumstances of their commission may be deemed sufficient to render the corporation liable to suit; that the satisfaction of the due process requirement depends upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process laws to ensure; that a corporation availing itself of the benefits and protections of the laws of the forum state, while accepting the privilege of engaging in activities therein, puts itself in a position where it may be made to respond to a suit to enforce obligations arising out of such activities—this can hardly be said to be contrary to common notions of justice and fair play.

*International Shoe* was the beginning of a trend, and in *McGee v. International Life Insurance Co.*,[7] (which sustained the personal jurisdiction of California), the court, in commenting on this trend said:

Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

\* \* \* \* \* \*

It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State.

That the trend begun in *International Shoe* does not countenance the removal of all restrictions on the acquisition of personal jurisdiction by state courts is pointed out in *Hanson v. Denckla*[8] where it was said that such restrictions amount to more than a guarantee of immunity from inconvenient or distant litigation, they are, in fact, a consequence of territorial limitation on the power of the respective states. It was pointed out that minimal contacts are necessary, and the sufficiency of the minimal contacts will vary with the quality and nature of the defendant's activity. Further, that a defendant purposefully availing itself of the privilege of engaging in activities within the forum state, invokes the benefits and protections of its laws.

Both *McGee* and *Denckla* were single occurrence cases. In *McGee* a Texas insurance company solicited a California resident, via mail, to purchase insurance; and the California resident accepted the offer, paid the premiums until his death, via mail. In *Denckla,* it was held that the Florida court did not acquire personal jurisdiction over a Delaware trustee to determine the validity of a trust established by a settlor, who while domiciled in Pennsylvania, executed a trust in Delaware, and subsequently moved to Florida. Such was not an activity of the quality and nature to establish minimal contact within Florida; nor was there an act by which defendant purposefully availed itself of the privilege of engaging in activities within the forum state, thus invoking the benefits and protections of its laws. *Denckla* draws the outer limit of state judicial power over a nonresident defendant. The activities of Plastics, in this matter, bear no relation to the limitation of *Denckla.* About the only similarity is each involves litigation, between a plaintiff and defendant.

From the foregoing it can be seen that the evolution of the law controlling state

---

7. 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

8. 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

judicial power, over nonresident defendants, has evolved to accommodate changing conditions. This evolution shows acceptance and then abandonment of "consent," "doing business," and "presence," as conceptual determinants of state judicial power over foreign corporations.

As was said in *Foreign Study League v. Holland-America Line* [9] cases of this nature are strictly factual and are disposed of by the application of case and statutory law of the fact situation presented. A review of the undisputed facts is helpful.

A contract was executed, $25,000 was paid by Ski to Plastics; Plastics' agent conducted activities within this State to promote the sale of its product. These activities were in aid of the contract, which contemplated a series of long-term commitments, and payment of further substantial sums. The commitments to be performed in Utah were a sine qua non of the contract. Pursuant to the contract, Ski secured orders, within the state of Utah and elsewhere; in the amount of $218,000, for the purchase of Plastics' product.

From the foregoing, we can see that Plastics purposefully availed itself of the privilege of acting within the state of Utah; thereby causing a consequence, with a substantial connection, in this State. It is further evident that Ski's claim arose from the activities of Plastics here. In addition, it is apparent that the acts of Plastics and the consequence caused by Plastics had a substantial connection to this State; a connection, which created contacts within this State, and makes the exercise of the jurisdiction of this State over Plastics reasonable. It cannot be doubted that this State has an interest in such activities, and in the protection of its citizens, from harm suffered because of such activities.[10]

A state case illuminating here is that of *Knight v. District Court of the 17th Judicial District, County of Adams, State of Colorado.*[11] There a Colorado bank brought an action in Colorado, on a promissory note, against two citizens of Salt Lake City, Utah, serving the petitioners in Utah. The action was brought under a long-arm statute similar to our own. The petitioners had personally appeared in Colorado to borrow the money. Thereafter a renewal note was executed by petitioners in Salt Lake City, and sent by mail to the bank in Colorado. The claim of petitioners was the Colorado bank did not have jurisdiction over their persons. Among other things the court said:

. . . though the "last act," such as the signing of a contract, for example, may have occurred outside the geographical confines of the forum state, nevertheless the statutory test of a claim arising out of the transaction of any business within the state may still be met by the showing of other "purposeful acts," performed within the forum state by the defendant in relation to the contract, even though such acts were preliminary, or even subsequent, to the execution of the contract itself. So, in the instant case, though the petitioners admittedly executed the renewal note in Utah, they had each nonetheless performed in Colorado several "purposeful" acts relative thereto. . . . it seems to us to be eminently fair and just to require the petitioners, who were able to come over the mountain to borrow $30,000, to return when they are allegedly in default as concerns repayment of the loan.

In the instant matter, the mountain is a different one, but the principle is the same. Traditional notions of justice and fair play require Plastics to return and respond to the allegations of Ski.

9. 27 Utah 2d 442, 443, 497 P.2d 244 (1972).

10. *Southern Machine Co. v. Mohasco Industries Inc.*, C.A.6th 1968, 401 F.2d 374.

11. 162 Colo. 14, 424 P.2d 110 (1967).